Anna Feinberg, Respondent, v. New England Mutual Life Insurance Company, a Corporation, Appellant.—168 S. W. (2d) 141.

Kansas City Court of Appeals. December 7, 1942.

332

*Howard F. Major, Roach & Brenner* and *Ralph L. Alexander* for respondent.

*Richard S. Righter* and *Sam D. Parker* for appellant.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau* of counsel.

SHAIN, P. J.—This is an action on a life insurance policy issued by the New England. Mutual Life Insurance Company to George Alex Feinberg and wherein Anna Feinberg, his wife, was designated as beneficiary.

On May 27, 1940, the aforesaid insured died, and this action was begun in the Circuit Court of Boone County, Missouri, on October 28, 1940, by the aforesaid beneficiary, Anna Feinberg, as plaintiff, filing petition in said court wherein the aforesaid insurance company is designated as defendant.

Plaintiff's petition makes due allegation as to execution of policy, that same was in effect at the time of insured's death, designating face of policy as $2000, and duly alleges plaintiff as beneficiary.

Further pleading, the plaintiff alleges as follows:

"Plaintiff further states that within a reasonable time after the death of the said Alex George Feinberg, she gave the defendant due notice of his death and that all proofs furnished by the defendant were executed by this plaintiff; that said defendant has paid the plaintiff the sum of Six Hundred Eight and 10/100 ($608.10) Dollars and has wrongfully. and without lawful excuse denied any further liability upon said policy and wrongfully and without lawful excuse denied any further liability upon said policy and wrongfully and vexatiously, willfully and without reasonable care refused to pay the plaintiff the amount due under said policy; that by reason of said wrongful and vexatious refusal to pay plaintiff has been compelled to and did employ attorneys to prosecute this suit for and on her behalf, and is entitled to ten (10%) per cent of the balance due under said policy as a penalty for vexatious refusal to pay and a reasonable sum for attorneys' fees."

The plaintiff prays judgment for $1391.91 as balance due and asks statutory penalty of ten per cent and for attorneys' fees.

The real issues in the case are clearly presented by defendant's answer and plaintiff's reply and will be more clearly understood by quotations from the aforesaid pleadings.

The defendant makes general denial and thereafter alleges as follows:

"2. Further answering said petition, defendant states that on March 3, 1911, defendant duly issued its policy of life insurance in the face amount of Two Thousand Dollars ($2,000) to Alex George Feinberg, in consideration of the payment by said Feinberg of the annual premium thereon of Fifty Seven Dollars ($57); that thereafter an annual premium on said policy fell due on the 3rd day of March, 1929; that said Feinberg failed to pay said premium on said date or within the period of grace of thirty-one days thereafter, provided for in said policy (or to pay any subsequent premium thereon), and that said policy thereupon lapsed for failure to pay said premium; that thereupon, the insured having elected no other nonforfeiture option, by the terms of said policy the cash value thereof, the amount of which was Two Hundred Seventy-two and 95/100 Dollars ($272.95) (after deducting from said value the amount of the indebtedness to defendant then standing against said policy), automatically purchased paid-up insurance; that said sum was sufficient to and did purchase paid up insurance in accordance with the terms of said policy in the amount of Six Hundred Five Dollars ($605); that upon the death of said Alex George Feinberg on or about the 27th day of May, 1940, this defendant duly paid the full paid up value of said policy to plaintiff, the beneficiary thereunder, and was thereupon, by said payment, under the terms of said policy, fully discharged from any and every liability thereunder.

"3. Defendant further states that said Alex George Feinberg applied for said policy while said Feinberg was a citizen and resident of the State of Minnesota; that he paid the first premium on said policy in said state and that said policy, upon its issuance by defendant, was duly delivered to said Feinberg in said state; that said policy and all the terms, provisions and conditions thereof are governed by the laws of the State of Minnesota, and particularly by Section 3392, Mason's Minnesota Statutes, 1927, which reads as follows:

"'3392. Automatic paid-up extended insurance in certain cases— In event of default in payment of any premium due on any policy, provided not less than three full years' premiums shall have been paid, and provided further, such policy shall not be continued in force by virtue of an automatic loan provision therein, there shall be secured to the insured without action on his part, either paid or extended insurance as specified in the policy, the net values of which shall be at least equal to the entire net reserve held by the company on such policy, less two and one-half per centum of the amount insured by the policy and dividend additions if any, and less any outstanding indebtedness to the company on the policy at time of default. There shall be secured to the insured the right to surrender the policy to the company at its home office within one month after date of default for the cash value otherwise available for the purchase of the paid-up or extended insurance as aforesaid. Such cash payment to be made within six months after demand therefor.'

"4. Further answering said petition, defendant states that the aforesaid default in the payment of premiums under said policy and the application of the said cash value of said policy to the purchase of paid up insurance occurred more than ten years prior to the death of said Feinberg and prior to the commencement of this action; that any claim of said insured or of this plaintiff to any sum or sums in excess of the paid up insurance provided for in said policy and heretofore paid plaintiff has been and is barred by the statutes of limitations of the State of Missouri; that said Feinberg was a citizen and resident of the State of Missouri on March 3, 1929, and since said date.

"5. Defendant further states that the said Alex George Feinberg knew at the time of the lapse of said policy in 1929 that the cash value of said policy was, upon said lapse, used to purchase paid up insurance in the amount of Six Hundred Five ($605) Dollars and by his silence from that time until the date of his death on May 27, 1940, said Feinberg consented thereto and acquiesced therein; that plaintiff is thereby estopped from claiming and has waived the right to claim that she is entitled to recover the face amount of said policy less a credit of Six Hundred Five ($605) Dollars, or that said policy after the lapse thereof was or should have been continued in force as extended insurance to and including the date of the death of said insured.

"Wherefore, having fully answered, defendant prays to be discharged and to have its costs herein."

Plaintiff's reply, after general denial as to answer, is as follows:

"2. Further replying to said answer, plaintiff states that in March, 1929, Alex George Feinberg, the named insured in the policy of insurance mentioned in plaintiff's petition, was advised by the defendant company that he could continue the aforesaid policy of insurance in force and effect as extended term insurance for the face of the policy for a period of more than fifteen years; that at said time the said Alex G. Feinberg did make written application and did deliver the same to the company, in which he requested the company to give him extended term insurance for the face of the policy for said period; that as extended term insurance, said policy did remain in force and effect until January 15, 1950, for the sum of Two thousand ($2,000)' Dollars less his indebtedness to the defendant company or in the net amount of One Thousand Four-Hundred Sixty-Three ($1,463) Dollars; that prior to said date, to-wit, on May 27, 1940, the said Alex G. Feinberg died, and plaintiff is entitled as beneficiary under said policy to said sum of One Thousand Four-Hundred Sixty-Three ($1,463) Dollars, less Six-Hundred and Five ($605) Dollars which has been paid to her by said defendant, or the sum of Eight Hundred Fifty-Eight ($858) Dollars together with a penalty of 10% for vexatious delay, plus Five Hundred ($500) Dollars as a reasonable attorneys' fee.

"3. Further replying to said answer, and in the alternative, the plaintiff states that on March 3, 1929, the date the said Alex G. Feinberg failed to pay the premium on said policy of insurance, the said insured was entitled to paid up insurance in the sum of One Thousand Seven-Hundred Ninety-Six ($1,796) Dollars; that on said date the said insured was indebted to the defendant on said policy in the sum of Five Hundred Forty-Six ($546) Dollars, leaving One Thousand Two Hundred Fifty ($1,250) Dollars of paid up insurance, to which plaintiff is entitled as beneficiary; that on said sum the plaintiff has been paid the sum of Six Hundred Five ($605) Dollars, leaving a balance due of Six Hundred Forty-Five ($645) Dollars due to this plaintiff from defendant; that plaintiff is entitled to said sum of Six Hundred Forty-five ($645) Dollars, plus 10% for vexatious delay, plus Five Hundred ($500) Dollars for an attorney's fee.

"Wherefore, having fully replied, this plaintiff prays for judgment in accordance with the prayer of her petition."

At the trial defendant filed motions to strike plaintiff's reply, to strike paragraph two of reply and motion to strike paragraph three of reply. All of said motions were overruled, and as the action of the court as to same is not discussed in defendant's brief, we are not called upon to consider same.

Trial was by jury, resulting in verdict for plaintiff on the policy in the sum of $850 and $250 attorneys' fee. Judgment was responsive to the verdict, and from said judgment the defendant duly appealed.

### OPINION.

We will continue to refer to the parties as plaintiff and defendant to conform to the situation in the trial court.

There are many questions presented by exceptions shown in the record and by numerous points presented and discussed in the briefs filed herein. After a careful study of briefs and record, we conclude that by inclusion herein of pleadings, *supra,* that the same clearly presents premises from which conclusions may be reached as to what are the substantial rights between the parties and to then determine the respective rights from the facts and circumstances in evidence.

Plaintiff admits policy to be a Minnesota contract.

There appears to be no dispute but that there was a default in the payment of premium on March 3, 1929, eighteen years after the policy was issued, and that there was a loan on said policy in excess of $500 when default occurred. It further appears that at the time of default the policy was deposited as collateral with the defendant insurance company.

The issue presented involves non-forfeiture provisions of the contract of insurance, which are as follows:

"CASH VALUES, PAID-UP AND EXTENDED INSURANCE—The Holder of this Policy, in case of default in the payment of any premium after

three full annual premiums have been paid hereon, shall be entitled to cash, paid-up or extended insurance for the amounts and terms stated in the table below, plus a proportionate part of the increase in the values at the end of the succeeding year if any instalment not less than a quarterly instalment of the premium for that year has been paid, and any dividend additions thereto; and during the term of grace or within thirty-one days thereafter, may by writing filed with the Company at its Home Office elect,—

"FIRST. To surrender the Policy and, with the written assent of the person to whom it is made payable, receive its value in cash; or

"SECOND. To take paid-up insurance for its then value; such paid-up insurance shall be payable at the same time and on the same conditions as in the original contract, and shall participate annually in the distribution of surplus and have increasing loan and cash values; or

"THIRD. To have the Policy continued in force as extended term insurance from the aniversary date last past for its face amount, including any outstanding dividend additions, and less any indebtedness thereon or secured thereby, but without the right to loans; such extended insurance will have a cash surrender value and will participate in the annual distribution or surplus made by the Company, the share apportioned thereto to be payable in cash.

"If, during said term of grace or within thirty-one days thereafter, the Holder shall not elect one of the foregoing options, then this Policy shall be automatically continued as paid-up participating insurance *for its then value as provided in the second option.*

"Any indebtedness to the Company for premiums, premium notes or policy loans shall be deducted from the surrender value if paid in cash, but if paid-up or extended insurance is taken, the amount or duration thereof shall be reduced proportionately."

The plaintiff claims that her rights came under classification designated as "Third." The defendant claims that plaintiff's right comes under classification designated as "Second."

The plaintiff introduced the policy in issue. When the policy was introduced the following is shown of record, to-wit:

"THE COURT: There is no dispute over the policy or the proof of death, is there?

"MR. ALEXANDER: No, I don't think so.

"THE COURT: Then let's proceed.

"MR. BECKER: We want to call the attention of the jury specifically to the endorsement on the policy, in red ink, dated 1929, where it is stamped there on the first page in the margin, 'This policy having lapsed for non-payment of the premium due Mar. 3, 1929, became paid-up under the Insurance Laws of the State of Massachusetts for the amount of $605.' We call attention to the endorsement stamp on the second page thereof where the table of values is, to the effect that the table of values stated there no longer obtains, that there

has been an endorsement of paid up insurance March 3, 1929—words to that effect.

"THE COURT: Very well."

Thereafter plaintiff introduced deposition of Webster D. Adams, an official of the defendant company.

The following questions and answers appear in the Adams deposition:

"Q. Will you outline what action was taken at the home office with respect to this policy after the expiration of the grace period for the payment of this premium due March 3, 1929? A. The receipt sent to the St. Paul agency for collection was returned to the Premium Collection Department. The card record was removed from the file and the notation given to the Actuarial Department that this premium had not been paid and the policy was subject to lapse.

"Q. What was the next step that was taken? A. The calculation of the paid up value.

"Q. Where was this calculation completed? A. In the Actuarial Department at the home office in Boston.

"Q. At the time of this lapse for nonpayment of the 1929 annual premium, where was the policy contract?

"MR. FLAVIN: When you say 'where was the policy contract,' what do you mean—the document that is in the home office or the one that the assured had?

"MR. BARKER: . I mean the one that the assured had.

"MR. FLAVIN: If this man knows where it was, all right. You mean, at the time the policy lapsed?

"MR. BARKER: Yes.

"MR. FLAVIN: Where was the policy which was originally delivered to the assured?

"MR. BARKER: Yes.

"MR. FLAVIN: That is, if he knows where it was.

"MR. BARKER: Yes, if you know that, Mr. Adams, you may answer.

"A. The policy was in the policy loan files at the home office.

"Q. Now will you explain how you know that the policy was in the home office files? A. There was a loan against this policy and in 1911 it was the practice of the company to keep all policies where loans were made on file in the Policy Loan Department as collateral.

"Q. Was this also the practice of the company in 1929? A. It was.

"Q. What disposition was made of the original contract after the lapse by the company?

"MR. FLAVIN: That is, if Mr. Adams knows.

"A. An endorsement was made on the policy showing that the policy had lapsed for nonpayment of the premium due March 3, 1929, and became paid up under the insurance laws of the State of Massachusetts for the amount of $605. It was then returned to the insured and to the beneficiary with a notification that the policy had lapsed for

nonpayment of the March 3, 1929, premium and had passed under the provisions of the Massachusetts law and was paid up for $605, and the collateral policy loan certificate of $512 was cancelled and under cover of the letter the policy was returned to the insured and the beneficiary.

"Q. Have you a copy of that letter? A. I have (Producing paper)."

The copy of the letter was duly identified and received in evidence and is in words and figures as follows:

"June 25, 1929 ffl

"Mr. Alex G. Feinberg

"Mrs. Anna Feinberg

"3729 Forest Avenue

"Kansas City, Missouri

"Dear Sir:

"You are hereby notified that by non-payment of the premium due March 3, 1929 your policy No. 233518 has passed under the provisions of the Massachusetts Law, and has become paid up for $605.00 and the collateral policy loan certificate of $512.00 is cancelled. We are enclosing under cover with this letter to you the policy, and a receipt form for it, which we ask that you will be kind enough to date and sign, and then return it to us.

"Yours very truly,<br>"ROBT. P. K. NEFF,<br>"Assistant Secretary."

Further questions and answers in the Adams deposition appear as follows:

"Q. How was it determined at the home office of the company that that option should be put into effect? A. No request was ever made during the thirty-one days of grace after the payment became due for any option in the policy, and according to the policy contract it was provided that the policy shall be automatically continued as paid-up participating insurance for its then value as provided in the second option.

"Q. Was any writing filed with the company at its home office whereby any of these nonforfeiture options were elected? A. There was nothing filed at this office making an election of nonforfeiture option.

"Q. In the absence of such an election what was the procedure adopted by the company in 1929 with respect to this policy? A. It was placed under the paid-up option.

"Q. Was any notation of this made on the contract? A. There was.

"MR. FLAVIN: You mean, the original instrument sent to the assured?

"MR. BARKER: Yes.

"THE WITNESS: There was.

"Q. Will you tell us what this notation was? A. This policy having lapsed for nonpayment of the premium due March 3, 1929, it became paid up under the insurance laws of the State of Massachusetts for the amount of $605.

"Q. It is the practice of this company to pay dividends on a paid-up policy such as this contract which you have testified was forwarded to the insured?

"MR. FLAVIN: After it has lapsed?

"MR. BARKER: After it has lapsed.

"A. It is the practice of the company.

"Q. And were the dividends paid in this case after the lapse? A. Dividends were paid after the lapse.

"MR. BARKER (Addressing the jury): Now, Gentlemen, we have here eleven checks. The first one is dated March 1st, 1930, New England Mutual Life Insurance Company, pay to the order of Alex G. Feinberg, six dollars on paid up policy No. 233518, signed by Dwight Foster, Assistant Treasurer."

Canceled checks were offered in evidence, all of which were of same purport. The last check was dated March 1, 1940, and was for $3.25. These dividend checks, yearly from 1930, were shown endorsed, some by the insured, others by both insured and plaintiff, the wife and beneficiary.

The plaintiff testified in her own behalf. She testified that she knew of the existence of the policy but that she had never seen the policy until after the death of her husband, when she found it in the file at home.

The plaintiff further testified that in the latter part of March, 1929, she drove her husband down to the Kansas City office of defendant and went into the office with him.

The following questions and answers appear in plaintiff's direct testimony:

"Q. When you got into the office, where did you go? A. He went up to the cage of the cashier.

"Q. And all that time you were with him? A. Yes, sir.

"Q. Did he have a conversation with the cashier there? A. Yes, he did.

"Q. Just state what was said. A. Well, I heard him tell him that his premium was due and that he could not pay it, and what should he do about the policy? The cashier asked him his name and turned to some files and brought out some papers there.

"Q. What else did the cashier say in reference to the policy? A. After checking these papers, he suggested that he take out extended term insurance, which would pay him up fourteen years without having to pay any premiums on it, and would still pay the full face of the policy in case of death within fourteen years.

"Q. What was done then? A. Mr. Feinberg said, 'That is just

what I want.' He got out an application and asked Mr. Feinberg some questions and Mr. Feinberg signed it.

"Q. Was anything else said? A. Yes. Mr. Feinberg said, 'Now will everything be all right?' and he said, 'Yes; don't worry, Mr. Feinberg, it will be taken care of.'

"Q. Who filled out the application? A. The cashier, and Mr. Feinberg signed it.

"Q. Did your husband sign it there in your presence? A. Yes, sir."

On cross-examination the following appears:

"Q. Mr. Feinberg never discussed the policy or his business with the Company, and during the time he was alive you didn't know anything about it at all? A. Only that time in 1929.

"Q. Except for that one instance—that is all you knew about it? A. Yes.

"Q. I am talking specifically about the policy—when I say you didn't know anything about it. A. No."

Thereafter the following is shown:

"Q. Now what was this application that someone handed you? A. It was a large sheet of paper, about that big (indicating).

"Q. Was it typed or printed? A. Printed.

"Q. It was printed? A. As far as I could see. I wasn't right up at the cage.

"Q. You were not close enough to read it? A. No.

"Q. You could not read it? A. No, I could not read it.

"Q. But you didn't see the policy there that day? A. No.

"Q. He went down to make this arrangement and if he did make it he didn't take the policy along? A. No."

Concerning the dividend checks the testimony of plaintiff, on cross-examination, is shown as follows:

"Q. For months. . . . . You knew, of course, that Mr. Feinberg was getting these dividend checks on this policy, didn't you? A. I don't remember.

"Q. You don't remember whether you knew it, or not? A. No.

"Q. You remember endorsing the one check? A. Yes—because he was paralyzed. He could not move his hand.

"Q. You remember that? A. Yes, sir.

"Q. You just don't know how many others he got? A. No.

"Q. Or what it was all about, at all? A. No."

The deposition of Roland B. Dow, assistant actuary of the defendant company, was placed in evidence. The testimony of Mr. Dow was as to computation upon which the amount of paid-up insurance was based. However, there appears no serious contention to the effect that said computation as based on "Second" clause of nonforfeiture provision is incorrect. The contention of the defendant is based upon asserted rights under clause "Three."

From a study of the non-forfeiture provisions of the policy, we conclude that the same is free from ambiguity.

Based upon the pleadings, admissions and evidence, oral and documentary, *supra,* we summarize our conclusion.

The showing of the record is clearly to the effect that there was a default in premium on March 3, 1929, and that there was at the time a loan on the policy and that the policy was in the hands of defendant at its home office at time of default.

The uncontradicted evidence is that, after thirty-one days of grace, provided in case of default, the defendant computed as to the insured's right under sub-section "Second" and prepared a letter to the insured wherein it was plainly stated, as enclosed, the collateral note and the policy herein in issue, and under cover of letter, June 25, 1929, *supra,* the policy was returned to the insured. It is further shown that the policy had plainly endorsed thereon, "This policy having lapsed for non-payment of the premium due Mar. 3, 1929 becomes paid up under the insurance laws of Massachusetts for amount of $605." The policy also contains a table of loan, cash, paid-up and extended insurance values, and there is a notation thereon as follows: "Policy having become paid-up for a reduced amount these values do not apply."

The above oral and documentary evidence finds corroboration in the fact that the policy, so endorsed, was found in the files of insured in his home after his death and a corroborating inference can be drawn from the fact, not disputed, that the note of insured to the defendant was canceled and returned to him in said letter.

In addition to the above, the undisputed documentary evidence shows that for a period of eleven years, from and after March, 1929, to March, 1940, eleven dividend checks on said policy were duly sent to the insured and cashed by the insured.

The only evidence offered to refute the above and foregoing, is the oral testimony of the plaintiff, *supra,* as to a conversation between insured and some unidentified person in the Kansas City office of defendant, whom she designates as cashier. This testimony of conversation is set forth, *supra.*

Having summarized as to facts in evidence, we must give consideration of the law as applying to the facts.

The defendant herein, at the close of all of the evidence, asked for a directed verdict in its behalf. As to same, the defendant urges as follows:

"Plaintiff offered no evidence that a writing was filed with the company at its home office, as the policy *requires,* electing to have the policy continued as extended term insurance." (Italics ours.)

As to election thirty-one days after default the policy reads, "*May by a writing* filed with the company in its home office elect—" (Italics ours.)

Defendant cites Scott v. Continental Auto Ins. Co., 326 Mo. 92, 31 S. W. (2d) 7.

The above case has under consideration proof of loss and in the opinion the general rule as declared in 46 C. J. 559, is quoted with approval. The above opinion, l. c. 105, Mo. Reports, states as follows:

"According to a general rule, where notice is required to be given by statute, or contract, and the manner of serving the notice is not prescribed, personal service is intended. There is also an auxiliary rule, likewise general in application, that has the support of authority: 'In the absence of custom, statute, estoppel, or express contract stipulation, when a notice, affecting a right, is sought to be served by mail, the service is not effected until the notice comes into the hands of the one to be served, and he acquires knowledge of its contents.'"

In the above opinion on page, *supra,* the opinion quotes with approval the rule of interpretation as found in (6 R. C. L. 837, sec. 227).

The opinion reads as follows:

"But the rules just referred to are merely rules of construction—at least when applied to contracts. They are not controlling, therefore, where it is manifest from the instrument as a whole that the intention of the parties would be thwarted, rather than given effect, by their application. A more important rule in the construction of contracts is that the interpretation must be upon the entire instrument, and not merely upon disjoined or particular parts of it. 'The whole context is to be considered in ascertaining the intention of the parties, even though the immediate object of inquiry is the meaning of an isolated clause.'"

Defendant also cites Brown v. Mutual L. Ins. Co. of New York (Mo. App.), 140 S. W. (2d) 62.

In the above case the policy did not require due proof of loss to be furnished in any particular way and it was held that a certain letter written by the insured detailing the facts and claim was sufficient proof.

The above cases are clearly distinguishable from the case at bar.

The contract, of insurance herein does assert that election, as to non-forfeiture provision clauses, may be a writing filed with the company at its home office "Elect—" However, the cases cited, supra, nor any case cited by defendant, justifies the conclusion that an election could not be made any way other than by notice in writing. We conclude that the language quoted from the opinion in Scott v. Auto Insurance, *supra,* as to rules of construction, negatives the contention of defendant that election, under the terms of the contract here, absolutely requires election by writing.

With our above conclusion in mind, we conclude and hold that under the facts, documentary and otherwise, in evidence herein, the plaintiff is not entitled to recover herein unless there be substantial evidence from which it can be reasonably inferred that the insured, within the period of thirty-one days of grace, did actually make and stand upon an election based upon clause "Three" of the non-forfeiture provision of the contract of insurance.

As to the manner of election, we are not herein determining. However, we conclude that an election contemplates a meeting of minds on the matter agreed upon.

We have above set forth the oral testimony of plaintiff detailing conversation between her husband, the insured, and an unidentified man in the Kansas City office of defendant.

We conclude that it might be reasonably inferred that this unknown person had authority to act.

We further conclude that the conversation narrated by plaintiff presents direct evidence that the insured stated that he wanted extended insurance, and that the person with whom the conversation was had assured the insured that it would be taken care of.

As to the sheet of paper "printed," which plaintiff says the insured signed, there is no direct evidence as to its purport and contents. However, we conclude there is evidence from which it might be reasonably concluded that the paper signed was an application for extended insurance. After giving the most favorable inference to plaintiff's testimony, we are confronted with certain undisputed facts, to-wit: The policy of insurance was in the possession of the insured at the time of his death.

Endorsed in red ink, under date 1929, appears the following: "This policy having lapsed for non-payment of the premium due Mar. 3, 1929, becomes paid-up under the insurance laws of the State of Massachusetts for the amount of $605."

Further upon the table of values contained in the policy a similar endorsement appears.

Further, it is clearly shown that for a period of eleven years dividend checks on this policy, endorsed as paid-up, were duly received and receipted for by insured, and there is no evidence of any complaint being made during these eleven years.

Regardless of the fact as to whether or not it is shown by any direct evidence or from any reasonable inference that the insured did make an election for extended insurance in March, 1929, undisputed facts in evidence are conclusive to the effect that for a period of eleven years before his death, the acts and conduct of said insured touching the situation of plainly endorsed "paid-up insurance for $605" is such that works in law an estoppel. [Christenson v. New York Life Insurance Co., 160 Mo. App. 486, 141 S. W. 6; Doughtery v. Mutual Life Ins. Co. of New York, 226 Mo. App. 570, 44 S. W. (2d) 206.]

In other words, we conclude that the undisputed facts, as set forth above, justify us in holding that the plaintiff is estopped, as a matter of law, from asserting any right under sub-section "Third" of the non-forfeiture provisions of the policy in issue.

There are other questions presented in defendant's assignments of error which we refrain from discussing herein for the reason we

conclude that defendant's demurrer in the nature of a directed verdict for defendant, offered at the close of all the testimony, should have been sustained.

The judgment is reversed. All concur.